# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4455 | **DATE** | 6/26/2001 |
| **CASE TITLE** | Susie Murray vs. Larry G. Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** Commissioner's motion for summary judgment [doc. # 11-1] is denied and plaintiff's motion for summary judgment [doc. # 10-1] is granted. This case is reversed and remanded to the Commissioner for further development consistent with this opinion, pursuant to Sentence 4, 42 U.S.C. § 405(g).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | 13 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 6/26/2001 | |
| JJK | courtroom deputy's initials | 01 JUN 26 PM 3: 51 date mailed notice | |
| | | JJK | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SUSIE MURRAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 00 C 4455 |
| vs. ) | Magistrate Judge Schenkier |
| ) | |
| LARRY G. MASSANARI, ) | |
| Acting Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

JUN 27 2001

## MEMORANDUM OPINION AND ORDER[2]

This plaintiff, Susie Murray ("Ms. Murray"), seeks judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of a final decision by the Commissioner ("Commissioner") of the Social Security Administration ("the Agency") denying her application for Disability Insurance Benefits ("DIB"), pursuant to Title II, 42 U.S.C. § 423 (as amended), and Supplemental Security Income ("SSI"), pursuant to Title XVI, 42 U.S.C. § 1381 *et seq.* On March 27, 1998, Ms. Murray filed an application for DIB and SSI, alleging a disability onset date of November 28, 1997 (R. 60). Ms. Murray alleged disability due to low back pain, right shoulder pain, and left and right wrist pain (carpal tunnel syndrome) (R. 16, 30). The Commissioner found that Ms. Murray satisfied the disability insured status at all relevant times (R.16). Nonetheless, the Commissioner denied Ms. Murray's application initially and on reconsideration (R. 26, 32). On January 20, 1999, Ms. Murray

---

[1] Larry G. Massanari, the acting Commissioner of Social Security, is substituted as defendant for Kenneth S. Apfel, the former Commissioner of Social Security. Fed.R.Civ.P. 25(d)(1).

[2] By the parties' consent, on September 8, 2000, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings and to enter final judgment (doc. #s 6,7,8).

appeared with an attorney representative, Mr. John Horn, and testified before an Administrative Law Judge ("ALJ") (R. 15-23). On June 3, 1999, the ALJ issued a decision finding that Ms. Murray was not disabled because she possessed the residual functional capacity ("RFC") to perform a limited range of light work (R. 22, ¶ 8). On June 15, 2000, the Appeals council denied review of the ALJ's decision, making this decision the final decision of the Commissioner and subject to judicial review by the district court. *See* 42 U.S.C. § 405(g); 20 C.F.R. § 416.1481. Ms. Murray filed a timely complaint in this Court on July 24, 2000.

Ms. Murray has moved for summary judgment (doc. # 10-1), seeking reversal of the Commissioner's decision denying her claim for SSI and DIB. The Commissioner has filed a cross-motion for summary judgment in his favor (doc. # 11-1). For the reasons set forth below, the Court denies the Commissioner's motion for summary judgment, and grants Ms. Murray's motion to reverse and remand the Commissioner's decision pursuant to Sentence 4, 42 U.S.C. § 405(g). *See, e.g., Nelson v. Apfel*, 210 F.3d 799, 801 (7th Cir. 2000) (decision to remand for further development of administrative record or direct immediate award of benefits is "fact-bound determination" and is left to discretion of district court). *See also Connor v. Shalala*, 900 F. Supp. 994, 1003-04 (N.D. Ill. 1995) (remand to consider vocational expert testimony not specifically addressed by Administrative Law Judge in decision denying benefits). The Court remands the case for the Administrative Law Judge to make credibility findings and provide explanations regarding the effect, *vel non*, of the pain medications that Ms. Murray takes on her residual functional capacity to perform a significant number of jobs in the national economy.

## I.

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (1998). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520 (1998); *see also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step (other than Step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* The ALJ's analysis at Step 5 typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform a particular category of work (*i.e.*, skilled or unskilled and sedentary, light, medium, heavy or very heavy work), as well as the availability of such work in the national economy.

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405 (g) (1988), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Where conflicting evidence

3

allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992).

Of course, this does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference. The ALJ "has a basic obligation to develop a full and fair record." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). The ALJ then must consider all relevant evidence in the record, and may not select and discuss only that evidence that favors his or her ultimate conclusion. *Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.* *See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)).

With these standards in mind, we summarize the administrative record and the ALJ's decision.

## II.

Ms. Murray was born on January 29, 1946 (R. 20, 60). She completed the tenth grade, and she married Walter Murray on December 18, 1967, at the age of 20 (R. 60). On July 15, 1985, Ms. Murray divorced her husband. Ms. Murray has four adult children, one of whom (a 25-year-old son) still lives with her (R. 262). Ms. Murray "did not work much during the time [she] was married" (R. 62). She did not work at all in 1973 or 1974, or 1985. When she did work, she did so primarily as a certified nursing assistant ("CNA"). In the 1990s, Ms. Murray completed a nine-week certification course to be a nursing assistant (R. 244). As a CNA, Ms. Murray's job involved patient care under the supervision of a registered nurse or licensed practical nurse (R. 246). In particular, Ms. Murray's job was to help patients in and out of bed, feed them, change them, bathe them, and help them go to the bathroom (R. 247, 280). This job involved a great deal of lifting (R. 247). It did not involve the provision of medical treatment, such as the administration of injections or other drugs (R. 247). Ms. Murray worked as a CNA from 1967-72 (R. 245), and then again from 1991 until approximately November 28, 1997, when she allegedly became disabled from lifting a patient who fell on her left arm and hand (R. 172-74, 184, 221).[3]

Ms. Murray also worked for the Cook County Jail from 1975 to 1979, and from December 1986 through July 1989, as an assembly line worker packing laundry detergent and shampoos made by Stepco Corporation, her employer (R. 248). As an assembly line worker, Ms. Murray's job

---

[3]The Court will accept November 28, 1997, as the last date Ms. Murray worked full-time, because that is the date in her application for benefits and the date the ALJ used for purposes of determining her insured status for DIB (R. 16). Moreover, Ms. Murray's application date is March 12, 1998, so any evidence that she was working (and not disabled) after her application date would be inconsistent with her allegations. While there was some indication that Ms. Murray worked on March 5, 14 and 15, 1998 (R. 74, 76, 240, 280-81), it appears from the record that the Agency determined that these three days constituted an "unsuccessful work attempt" which was not substantial gainful activity (R. 77).

5

similarly involved a great deal of lifting and twisting with her arms and her body (R. 249). At the administrative hearing, Ms. Murray testified that she would frequently lift one gallon jugs of liquid laundry detergent to pack them in a box (R. 248-50). Each box contained four gallons, and she was sometimes required to lift these boxes off the line and onto the floor (R. 249-50). The ALJ asked Ms. Murray if each gallon weighed from 8 to 10 pounds, but she would not speculate (R. 249). The ALJ assumed that a gallon weighed 8.75 pounds and approximated that each box weighed 40 pounds. Ms. Murray agreed (R. 250). Ms. Murray testified that she left this job at the recommendation of a doctor who, after performing surgery to remove a tumor, indicated that problems with her right arm and back precluded her from doing much lifting (R. 250-51).

## A. Ms. Murray's Testimony.

### 1. Ms. Murray's Medical Condition.

At the administrative hearing, Ms. Murray testified that the pain in her lower back has worsened since November 1997; she stated that, on a scale of one to ten, her pain level is at a nine without medication and a six with medication (R. 17, 252). Ms. Murray testified that the pain originates in her lower back and radiates down into her legs, mainly on her left side; and her left leg is going numb from her thigh to her knees (R. 253). She has also experienced right shoulder pain since November 1997 (R. 253-54). Ms. Murray testified that on a scale of one to ten, the pain level in her right shoulder is a ten without medication and a five or six with medication (R. 256). She also has pain at the base of her neck that began when her shoulder pain began (R. 256). On a scale of one to ten, this pain is a five without medication and is relieved but not eliminated with medication (R. 257). Finally, Ms. Murray testified that she has pain in her left hand due to carpal tunnel syndrome (R. 257). Ms. Murray stated that making a fist hurts her wrist (R. 257). Dr. Majid Serushan, a

6

doctor of geriatrics, recommended surgery, but she has refused the surgery because there is no guarantee that it would allow her to work with that hand (R. 258). Ms. Murray is right-handed, and she testified that she has very limited carpal tunnel in that hand (R. 259). Ms. Murray testified that these impairments, in combination, make it difficult for her to lift, bathe and cook (R. 259-60). She also suffers from asthma, which she treats with a Ventolin inhaler (R. 260).

Ms. Murray treats her pain with a variety of medications: Naproxin (500 mg.); Hydroxyzine (25 mg.); Salsalate (500 mg.); Prevacid (30 mg.); Ventalin Inhalation Aerosol (17 g.); and Vancenase pockethaller (R. 169, 261-62). Ms. Murray testified that the Naproxin causes her to become drowsy and sleepy; and the Hydroxyzine "knocks [her] out" so that she is like a "zombie the next day" (R. 261). Ms. Murray stated that the doctor reduced the Hydroxyzine dosage to 10 mg. rather than 25 mg. so that she would not be knocked out (R. 261). Ms. Murray stated that she takes these medications on an as needed basis (R. 261-62). Ms. Murray does not take the Hydroxyzine every day; in fact, she testified that the last time she had taken a pill was two weeks prior to the hearing (R. 262). However, later in her testimony, she testified that she takes the medication twice every day for pain and that she has to spend most of the day laying down because the pills knock her out (R. 277).

2. Ms. Murray's Daily Activities.

A typical day and night for Ms. Murray is as follows: she rises between 7:30 and 8:00 a.m.; she is up until about 1:00 or 2:00 p.m.; she naps until about 4:00 p.m., and then she goes to bed about 7 or 8 p.m. (R. 277-78). During the night she does not sleep well, even when she is not experiencing the side effects of her medicine. She stated that she is up about every two hours and sleeps only five or six hours a night (R. 262).

7

Ms. Murray testified that her daily activities include watching church on television; driving to the bank or the store occasionally; going to church two or three times a week; and visiting with her former sister-in-law -- who comes to visit her "almost every day" (R. 262-63, 265, 284).[4] Ms. Murray occasionally visits her mom in Chicago (R. 266-67); she went on vacation once to Atlantic City to attend a friend's wedding (R. 268-69); and she saw a movie eight or nine months before the hearing (R. 267). She has trouble sitting straight in a chair (due to pain) and usually uses a pillow (R. 267, 271). She cannot do housework like vacuuming or moping (R. 266); she cannot do yard work (R. 267-68); and she can only stand for approximately 10 minutes at a time without her leg going numb and her back hurting (R. 270-71). At the hearing, she testified that her twenty-five year old son helps her around the house (R. 266); and her former sister-in-law helps her with bathing, cooking and dressing (R. 286). Ms. Murray testified that she can sit for about 45 minutes with a cushion (R. 271). She can walk half a block before her left side goes numb (R. 271).

Ms. Murray's financial resources are limited. For a while, she received unemployment benefits of $412 per month; but those benefits have now ceased (R. 274-75). She also obtained a small workers compensation settlement in 1998 in the amount of $2300, from which she paid her attorneys fees of $400 (R. 273).

## B. The Vocational Expert's Testimony.

At the administrative hearing, a vocational expert ("VE") was called to testify regarding Ms. Murray's former work experience, skills and residual functional capacity ("RFC"). The VE also

---

[4]Ms. Murray's sister-in-law (Allison Walters) testified at the hearing (although the transcript does not reveal any separate swearing in of her as a witness because page 283 of the transcript is missing), and observed that Ms. Murray has trouble lifting with her left hand; has a lot of pain in her back and side; is getting worse not better; and takes medicine for the pain that makes her sleep a lot (R. 286). Ms. Murray's sister-in-law also helps her cook, dress, and bathe (R. 286-87).

testified regarding the types of jobs, if any, that Ms. Murray could perform in the national economy given her RFC. The ALJ asked the VE six hypotheticals, to which the VE responded as follows.

Assuming an RFC for light work, an age of 52, a tenth-grade education plus certification as a nursing assistant, and experience as an assembly line packer, the VE concluded that: (1) a person who had lost the ability for fine manual dexterity in the left, non-dominant hand, could return to the assembly line packer job; (2) a person who had lost both fine and gross manual dexterity in the left, non-dominant hand, could not return to any past relevant work, and there would not be any transferrable skills; but, she would be able to perform a significant number of jobs at the unskilled, light level in the Chicago Metropolitan area and two counties in the northwest Indiana region (*e.g.*, hostess (1700 jobs); information/reception clerk (2200 jobs), and security attendant (2400 jobs));[5] (3) a person who had lost the ability to sustain an 8-hour work day and a 40-hour work week would not be able to work full-time, especially if she had to lay down for any reason; (4) if the limitations of hypotheticals one and two (but not three) applied, and the person also lost the use of the right arm above shoulder level, this person could still perform all the positions listed in hypothetical number two; (5) if the limitations of hypotheticals one, two and four applied, and the claimant also had an asthmatic problem and needed work in a clean atmosphere, the jobs listed in hypothetical number two would still be available; and (6) if the limitations of hypotheticals one, two, four and five were present and the job did not require rapid movement of the neck, the claimant could perform all of the jobs listed in hypothetical two (R. 289-91).

---

[5] The ALJ mistakenly categorized this as a laundry attendant position in the administrative decision (R. 21, 289).

9

After the ALJ finished his hypothetical questions, Ms. Murray's attorney elicited the following testimony: (1) if the claimant could not move her neck rapidly, the answer in hypothetical six would not change; the claimant could still perform the jobs listed in hypothetical number two; but, (2) if a person had the RFC described in hypotheticals one through six and needed to lie down during the normal work day, then the VE said there is only one job such a person could perform: a mattress tester, and there is not a sufficient number of such jobs in the national economy to satisfy Step 5 of the sequential test (R. 291-92). The VE also opined that Ms. Murray had no transferrable skills to sedentary work and therefore could not perform any of those jobs (R. 292).

C. **The Medical Evidence.**

Ms. Murray's treating physician (an Internist) is Dr. Ed Nepomuceno, Jr. Dr. Nepomuceno has treated Ms. Murray for all of her conditions, and he has periodically referred her to specialists (R. 188, 198, 202). In addition, Ms. Murray was treated by Dr. Aaron E. Johns for her workplace injury from approximately September 24, 1997 through December 22, 1997 (R. 172-82). During this time, Dr. Johns referred Ms. Murray to Dr. Churl-Soo Suk, an orthopaedic surgeon, for her hand and wrist problems (carpal tunnel syndrome); and Ms. Murray continued to see her treating physician, Dr. Nepomuceno, for her back strain (R. 178, 181-182).

The record contains notes from Dr. Suk dated October 9, 16, 28, and 30, 1997, indicating that Ms. Murray had a sprained left wrist, carpal tunnel syndrome, was to wear a wrist brace and was released to work on light duty. There are also notes from Dr. Suk dated November 11 and 13, 1997, indicating no improvement in her wrist. Upon her return visit to Dr. Johns on December 8, 1997, examination revealed continuing tenderness, and he imposed a work restriction involving minimal use of the left hand (R. 18, 181).

10

The first note from Dr. Nepomuceno is dated February 3, 1997 (R. 138). The record contains many subsequent visits where Ms. Murray was treated for back, shoulder and chest pain (R. 113-138; 189-203). In general, these notes reflect a continuing pattern of deterioration in the arthritic condition in Ms. Murray's back (R. 189, 191, 193, 195, 197-98, 200, 202); increased back pain over time (R. 192, 198, 200, 202); obesity (R. 189, 191-95) (*cf.* R. 19); and drowsiness from certain pain medications (*e.g.*, "Elavil" -- which made her less sleepy when she cut down to 10 mg.) (R. 191, 197). Dr. Nepomuceno noted, however, that in April 1998, Ms. Murray denied any numbness and radiating pain (R. 200)

In April 1998, Dr. Serushan found that Ms. Murray had two separate problems: (1) low back pain secondary to fascia joint arthritis (osteoarthritis of the lumbar and cervical spine) on the left side; and (2) a fibromyalgia syndrome in her neck, spine and shoulders (R. 92).

## D.    The ALJ's Decision.

The ALJ determined that Ms. Murray was not disabled at Step 5 of the sequential evaluation (R. 22). In making this determination, the ALJ specifically found that Ms. Murray had a severe impairment or combination of impairments that preclude her from performing any past relevant work, and she did not have transferrable skills (R. 22). However, the ALJ found that Ms. Murray had the residual functional capacity to perform the requirements of work except for lifting more than 20 pounds occasionally or 10 pounds frequently; work that required fine manual dexterity; and work that required her to lift her right arm above shoulder level (R. 22). The ALJ also found that Ms. Murray must work in a clean atmosphere given her asthmatic condition (R. 22). Given this RFC, the ALJ concluded that Ms. Murray could perform a limited range of light work, and that there were

11

a significant number of jobs in the national economy that she could perform, given the vocational expert's testimony (R. 22).

In making this determination, the ALJ also found that Ms. Murray's allegations regarding her symptoms of pain were not fully credible (R. 22). The ALJ's opinion failed to address any of the evidence or testimony concerning Ms. Murray's claimed drowsiness, or the effect that would have on Ms. Murray's ability to work.

### III.

It is these latter two aspects of the ALJ's determination that give the Court pause: the unexplained credibility finding as to pain, and the unaddressed issue of Ms. Murray's alleged drowsiness from medication. We address each of these matters in turn.

Although an ALJ's credibility findings will not be overturned unless they are "patently wrong," *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000), the Seventh Circuit has found that an ALJ's determination or decision regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Apfel*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting Social Security Ruling 96-7p). In other words, it is not sufficient for the ALJ to make a single, conclusory statement that the claimant's allegations of pain have been considered and/or found not credible. *Id.* Instead, the ALJ must "build a bridge from the evidence to his conclusion." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000).

In this case, the ALJ states that his credibility finding is "set forth in the body of [the] decision" (R. 22). But, nowhere in that decision does the ALJ even minimally articulate the basis

for this finding. As the case law makes clear, pain can be disabling, and the ALJ is required not only to address the claimant's allegations regarding the existence of pain, but he must also minimally articulate his reasoning in rejecting those allegations as not credible. In this case, the ALJ did not even go as far as the ALJ in *Zurawski* in attempting to meet that burden. In *Zurawski*, the ALJ stated that he found the claimant's complaints of pain not credible due to inconsistencies in the record between the objective medical evidence and the claimant's daily activities. The ALJ, however, did not explain what those inconsistencies were, and the Seventh Circuit reversed and remanded the case to the Commissioner for further explanation on this point.

Here, the ALJ has not offered that kind of inconsistency as a justification for his finding that Ms. Murray's testimony about pain is not fully credible.[6] Instead, Ms. Murray's allegations of pain are completely disregarded in the calculus related to whether she has the RFC to perform light work in significant numbers in the national economy. Pain is especially relevant in this case, not only because Ms. Murray alleges that it precludes her from standing, sitting and walking for any length of time during an 8-hour day and a normal 40-hour work week (R. 264-65; 270-71), but also because Ms. Murray has alleged that she must take various medications to control the pain, and that those medications make her so drowsy that she must lay down and/or sleep after she takes them (R. 260-

---

[6]The ALJ's statement that "the claimant's activities of daily living and social functioning are incompatible with those of an individual totally incapacitated by pain" (R. 20) is far too conclusory to satisfy the requisite standards of review. In *Zurawski*, the ALJ called out the specific activities that he found inconsistent with the claimant's allegations of disabling pain (*e.g.*, washing dishes, helping children prepare for school, doing laundry and preparing dinner). The Seventh Circuit found that these minimal activities did not necessarily undermine or contradict a claim of disabling pain because these daily activities could be "punctured with rest" – unlike an 8-hour work day. 245 F.3d at 887 (citing *Clifford*, 227 F.3d at 872). Here, the ALJ does not even call out the particular daily activities that he believes undermine Ms. Murray's claims of disabling pain (and, indeed, there are very few daily activities she performs according to her testimony and the testimony of Ms. Walters).

13

62). We believe it was incumbent on the ALJ to explain his credibility finding on this point, which was central to her disability claim.

As for the evidence of drowsiness, the ALJ failed to address it at all -- even cursorily. The Commissioner admits to this, but argues that it was reasonable for the ALJ to ignore this point given certain inconsistencies in the record (*e.g.*, Ms. Murray complained to Dr. Nepomuceno that Elavil made her drowsy; but at the hearing she testified that it was Naprosyn and Hydroxyzine that "knocked her out") (Def.'s Mem. at 9). The Court disagrees. It is precisely when there is conflicting evidence on a key point that it is most important for the ALJ to explain how he resolves that conflict. That was certainly the case here, because the VE testified that if Ms. Murray in fact experienced the drowsiness she claims, she could not perform work that exists in significant numbers in the national economy.

While it is true that the ALJ "need not provide a complete written evaluation of every piece of testimony and evidence," *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995), it is the Commissioner's duty to weigh the evidence, resolve material conflicts and decide questions of credibility. *Richardson*, 402 U.S. at 399-400. Here, inconsistencies in the record regarding the side effects of Ms. Murray's pain medication may create a material conflict and raise questions of credibility. Failure to address these questions and provide even a minimal articulation of the facts in favor of Ms. Murray's position (*e.g.*, the VE's testimony; the treating physician's notes) and the rationale for rejecting Ms. Murray's allegations of drowsiness from the pain medications requires the Court to remand this case for further findings consistent with this opinion. *See Connor*, 900 F. Supp. at 1004. *Cf. Stewart v. Chater*, 993 F. Supp. 809 (D. Colo. 1998) (reversing ALJ who rejected claims of drowsiness as not credible).

On remand, the ALJ should pay particular attention to the standard set forth in *Zurawski* and the cases cited therein. In that decision (and others), the Seventh Circuit has instructed that an ALJ must initially determine whether the objective medical evidence supports the claimant's allegations of pain. If not, then the ALJ must still consider other factors, investigating "all avenues presented that relate to pain" -- especially observations by treating and examining physicians and third parties (such as Ms. Murray's sister-in-law). The ALJ must also consider the nature and intensity of the alleged pain, as well as the "dosage and effectiveness of any pain medications" and the claimant's daily activities (or lack thereof). *Zurawski*, 245 F.3d at 887-88 (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). *See also Clifford*, 227 F.3d at 871 (same). If the claimant's subjective allegations of pain are not supported by the objective medical evidence or any other evidence in the record, then the inconsistency between the evidence and the allegations may be probative of the claimant's credibility. *Powers*, 207 F.3d at 435-36 (court cannot find patently wrong ALJ's determination that claimant is not credible where discrepancy existed between degree of pain attested to by claimant and that suggested by medical evidence).

The Court therefore remands this case to the Commissioner to make specific determinations regarding Ms. Murray's pain and the side effects of her pain medications. The Court does not make any independent determination regarding Ms. Murray's credibility concerning the pain or drowsiness she experiences, but leaves that decision -- and consideration of the factors enumerated above and in the *Zurawski* opinion -- for the Commissioner on remand.[7]

---

[7] The Court finds that all other aspects of the ALJ's decision are supported by substantial evidence in the record, and that Ms. Murray, but for her alleged pain and need to take so many medications to control it, would be able to perform a limited range of light work in substantial numbers in the geographic area in which she resides. This is the testimony of the VE, and it is supported by the objective medical evidence regarding Ms. Murray's RFC.

15

## CONCLUSION

IT IS THEREFORE ORDERED that the Clerk of the Court deny the Commissioner's motion for summary judgment (doc. # 11-1) and grant the plaintiff's motion for summary judgment (doc. # 10-1) by reversing and remanding this case to the Commissioner for further development consistent with this opinion, pursuant to Sentence 4, 42 U.S.C. § 405(g).

**ENTER:**

*[signature]*
SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: June 26, 2001